**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Brittany S. Scott (State Bar No. 327132)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
       bscott@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENTOYA MITCHELL, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>  v.<br><br>SONESTA INTERNATIONAL HOTELS CORPORATION,<br><br>        Defendant. | Case No. 2:24-cv-02603-GW-SSC<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED
CASE NO. 2:24-cv-02603-GW-SSC

Plaintiff Kentoya Mitchell files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Sonesta International Hotels Corporation ("Defendant" or "Sonesta"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all California residents who have accessed and used sonesta.com, a website that Defendant owns and operates.

2. Defendant aids, employs, agrees with, or otherwise enables several third parties—CartStack LLC ("CartStack"); Google LLC ("Google"); Hotjar Ltd. ("Hotjar"); Koddi Inc. ("Koddi"); Quantum Metric, Inc. ("Quantum Metric"); and Functional Software, Inc. d/b/a Sentry ("Sentry") (collectively, the "Third Parties")—to eavesdrop on communications sent and received by Plaintiff and Class Members, including communications that contain sensitive and confidential information (i.e., "guest records," as defined by Cal. Civil Code § 53.5). By failing to procure consent before enabling the Third Parties' interception of these communications, Defendant violated the California Invasion of Privacy Act ("CIPA") §§ 631-632.

## PARTIES

3. Plaintiff Kentoya Mitchell is a resident and citizen of Los Angeles, California. In April 2023, Plaintiff Mitchell visited a website operated by Defendant, sonesta.com (the "Website). Plaintiff Mitchell was in California when she visited the Website. Upon accessing the Website, as alleged in greater detail below, Plaintiff Mitchell browsed and booked a Sonesta hotel. Each of these communications was intercepted in transit by the Third Parties—as enabled by Defendant—including communications that contained Plaintiff Mitchell's confidential "guest records," as defined by Cal. Civil Code § 53.5. Neither Defendant nor any of the Third Parties procured Plaintiff Mitchell's prior consent to this interception.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED        1
CASE NO. 2:24-cv-02603-GW-SSC

4.     Defendant Sonesta International Hotels Corporation is a Maryland corporation with its principal place of business at 400 Centre Street, Newton, Massachusetts, 02458.  Defendant does business across the nation and operates dozens of hotels throughout California.[1]

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action where there are more than 100 members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one member of the putative Class is a citizen of a state different from Defendant.

6.     The Court has personal jurisdiction over Defendant because Defendant has purposefully availed itself of the laws and benefits of doing business in California, and Plaintiff's claims arise out of Defendant's forum-related activities. Plaintiff accessed and navigated the Website while in California, and Defendant assisted the Third Parties with intercepting Plaintiff's communications in this District.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

**I.     The California Invasion of Privacy Act**

8.     The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens.  The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

---

[1] https://www.sonesta.com/locations/us/california.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    2
CASE NO. 2:24-cv-02603-GW-SSC

9. The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

10. Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

11. As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use . . . any information so obtained."

12. CIPA § 631(a) also penalizes [iv] those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED          3
CASE NO. 2:24-cv-02603-GW-SSC

13. As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

14. A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." Cal. Penal Code § 632(c).

15. Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation. Cal. Penal Code § 637.2(a)(1). Plaintiff does so, here, against Defendant.

## II.  California Civil Code § 53.5

16. As the California Legislature recognized, a "guest record" maintained by an owner or operator of an inn, hotel, motel, lodginghouse, or other similar accommodations is confidential. Such an owner or operator "shall not disclose, produce, provide, release, transfer, disseminate, or otherwise communicate, except to a California peace officer, all or any part of a guest record orally, in writing, or by electronic or any other means to a third party without a court-issued subpoena, warrant, or order." Cal. Civil Code § 53.5(a).

17. Per Cal. Civil Code § 53.5(c):

> "Guest record" for purposes of this section includes any record that identifies an individual guest, boarder, occupant, lodger, customer, or invitee, including, but not limited to, their name, social security number or other unique identifying number, date of birth, location of birth, address, telephone number, driver's license number, other official form of identification, credit card number, or automobile license plate number.

18. Further, the legislative history of § 53.5 indicates:

(a) In 1972, California voters amended the California Constitution to include the right of privacy among the "inalienable" rights of all people. The amendment established a legal and enforceable right of privacy for every Californian. Fundamental to this right of privacy is the ability of individuals to control the use of their personal information.

(b) Since California voters approved the right of privacy, the California Legislature has adopted specific mechanisms to safeguard consumer privacy, including the California Consumer Privacy Act of 2018, the Online Privacy Protection Act, the Reader Privacy Act, the Privacy Rights for California Minors in the Digital World Act, and Shine the Light, a California law intended to give Californians the 'who, what, where, and when' of how businesses handle consumers' personal information.

(c) Californians frequently have to disclose their sensitive personal information to third parties in order to accomplish routine activities: apply for a job; apply for housing; raise a child; drive a car or take transportation; or stay at a hotel or motel.

(d) California law has not kept pace with these developments and the personal privacy implications surrounding the collection, use, and protection of personal information by third parties.

(e) Many businesses collect personal information from California consumers. They may know where a consumer lives, how many children a consumer has, where a consumer lives and works, where a consumer travels and where they stay on their trip, how fast a consumer drives, a consumer's personality, sleep habits, biometric and health information, financial information, precise geolocation information, and social networks, to name a few categories.

(f) The unauthorized disclosure of personal information and the loss of privacy can have devastating effects for individuals, including financial fraud, identity theft, unnecessary costs to personal time and finances, destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm.

(g) When Californians leave their homes to travel via bus or stay at lodging establishments throughout their state, they desire assurances that these businesses will respect their privacy and safeguard their

personal information from improper disclosure.

(h) Protecting the privacy of personal information promotes consumer confidence and encourages both residents and visitors to travel to and within California and to patronize California businesses.

(i) Therefore, it is the intent of the Legislature to further Californians' right to privacy by ensuring that the personal information disclosed by patrons of lodging establishments and bus companies is used for the intended business purposes and not improperly disclosed.

California S.B. 1194 (September 27, 2018).[2]

19. Here, Website users' communications with Sonesta—made while browsing and booking Sonesta hotels via the Website—contain sensitive and confidential "guest records," as defined by Cal. Civil Code § 53.5.

20. First, the communications include "record[s] that identif[y] an individual[.]" Cal. Civil Code § 53.5(c). As described *infra*, the Third Parties' tracking technologies compel Website users' browsers to transmit "unique identifying number[s]" assigned to Website users, including values stored in cookies. Cal. Civil Code § 53.5(c). The Third Parties' tracking technologies further intercept personal information (i.e., first name, last name, email address, phone number) typed by Website users while checking out on sonesta.com. These are all "record[s] that identif[y] an individual[.]" Cal. Civil Code § 53.5(c).

21. Second, Website users' communications with Sonesta "identif[y] an individual [as a Sonesta] guest, boarder, occupant, lodger, customer, or invitee[.]" *Id.* The Third Parties intercept Website users' text entry and button clicks selecting the destination to which they wish to travel, the desired dates for their trip, the number of rooms they require, the numbers of adults and children who will be traveling, and the particular hotel and room type in which they wish to stay. Third Parties also intercept the URLs of webpages visited by Website users—containing the foregoing

2 https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id= 201720180SB1194.

communications.  These communications "identif[y] an individual [as a Sonesta] guest, boarder, occupant, lodger, customer, or invitee" (Cal. Civil Code § 53.5(c)) because they show that all Website users are "invitees" of Sonesta—individuals with "express or implied invitation to enter or use [Sonesta's] premises."[3]  These communications also identify certain Website users (those who complete the booking process) as Sonesta hotel "guests" and "customers."

22.    Thus, the Third Parties—as aided by Defendant—intercepted "guest records," which are confidential, under Cal. Civil Code § 53.5.  Moreover, none of the Third Parties is a legitimate "third-party service provider," as defined by Cal. Civil Code § 53.5(f), because none of the Third Parties is "an entity contracted to provide services outlined in [a] contract [with Sonesta] that has no independent right to use or share the data beyond the terms of the contract."  Rather, the Third Parties have the capability to use the information they wiretap for purposes other than simply providing a recording to Defendant.  *See infra* § VI.  Therefore, Sonesta's conduct here at issue was not permitted by, *inter alia*, Cal. Civil Code § 53.5(i).

## III.  Overview of Defendant's Website

23.    Defendant owns and operates the Website.  Defendant has integrated the Third Parties' wiretaps into the Website.

24.    On the Website, Website users can, *inter alia*, browse and book Sonesta hotels.  When doing so, Website users provide Defendant with confidential information, including "guest records" under Cal. Civil Code § 53.5.  *See supra* § II.

25.    Unbeknownst to Plaintiff and Class Members, however, Defendant aids, agrees with, employs, or otherwise enables the Third Parties to eavesdrop on those confidential communications using the Third Parties' respective wiretaps, as set out *infra*.

26.    Website users' confidential communications are the product of Website

---

[3] INVITEE, Black's Law Dictionary (11th ed. 2019).

users affirmatively entering, and interacting with, information on the Website (*i.e.*, the confidential communications are not procedurally or automatically generated). Instead, as set out below, the confidential communications stem from Website users typing into data fields, conveying responses to questions and prompts, and actively making other selections. All of the foregoing is information created through the intent of Website users: information created by and in response to Website users' communicative inputs; information created by and in response to Website users' intended messages to the Website and Defendant; and information created by and in response to Website users' having conveyed and expressed their respective desires that the Website would supply them with certain, highly personalized, types of information and/or responses.

27. Website users may browse and book Sonesta hotel rooms. To do so, users type and/or select from a list the destination to which they wish to travel. Next, users click the dates for their trip, the number of rooms required, the number of adults and children who will be traveling, any children's ages, and/or special rates for which they are eligible. The Third Parties, as enabled by Defendant, contemporaneously intercept Website users' text entry and button clicks selecting such items:



28.   Then, Website users review the Sonesta hotels located in or near their destination and click on a particular hotel to book.  Website users subsequently pick the type of room (i.e., double, queen, king bed, etc.) in which they wish to stay.





29. Finally, Website users check out by typing their personal information (first and last name, email, phone number), selecting a rate (i.e., best flexible rate, Sonesta Travel Pass member rate, etc.), and entering their payment information.

## IV. Defendant Aids, Agrees with, Employs, or Otherwise Enables Hotjar, Quantum Metric, and Sentry to Wiretap Californians' Communications with Session Replay, in Violation of CIPA

### A. Overview of Session Replay

30. Hotjar, Quantum Metric, and Sentry each wiretap the Website with technology called "session replay."

31. Session replay, as noted in a 2017 piece by Princeton University researchers, is "unlike typical [Internet] analytics services [like cookies] that provide aggregate statistics[.] [Rather,] these scripts are intended for the recording and playback of individual browsing sessions, as if someone is looking over your shoulder."[4] That is, session replay works by using "embedded snippets of code … [that] watch and record a visitor's every move on a website, in real time."[5]

---

[4] Steven Englehardt, *No boundaries: Exfiltration of personal data by session-replay scripts*, Nov. 15, 2017, https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/.

[5] Tomas Foltyn, *What's the Deal with Session-Replay Scripts?*, WELIVESECURITY, Apr. 20, 2018, https://www.welivesecurity.com/2018/04/20/whats-deal-session-replay-scripts/.

---

32.     Hotjar explains, in a page titled "How do Recordings Work: Advanced Explanation[,]" that "[r]ecordings are created … [by] captur[ing] the data from your site during a user's session."[6]  "When a user opens a webpage where Hotjar is installed, a WebSocket connection is established. This connection is a real-time communication channel between the user's browser and Hotjar's servers."[7]  "After the WebSocket is opened, Hotjar captures the initial HTML content and DOM tree from the recorded user's session ... using the [Mozilla] MutationObserver API[.]"[8] Per Mozilla, "Document Object Model (DOM) is the data representation of the objects that comprise the structure and content of a document on the web."[9]

33.     Quantum Metric explains that "Quantum Metric session replay … bas[es] data capture off of the user's view of the document object model (DOM)[.]"[10] "The DOM, or Document Object Model, is where a website's or application's HTML, CSS, and JavaScript are located. Each event–including scrolls, taps, clicks, and keystrokes–alter the DOM's structure. Each time the DOM changes, it's called a DOM mutation."[11]  Quantum Metric's "technology records how the DOM changes through a session. This recreates the website in question as well as each individual event or action taken by the user."[12]

---

[6] HOTJAR, HOW DO RECORDINGS WORK: ADVANCED EXPLANATION, https://help.hotjar.com/hc/en-us/articles/21825186925207-How-do-Recordings-Work-Advanced-Explanation.

[7] Id.

[8] Id.

[9] MOZILLA CORPORATION, INTRODUCTION TO THE DOM, https://developer.mozilla.org/en-US/docs/Web/API/Document_Object_Model/Introduction.

[10] QUANTUM METRIC, SESSION REPLAY, THE RIGHT WAY, https://www.quantummetric.com/platform/session-replay/.

[11] QUANTUM METRIC, WHAT IS SESSION REPLAY FOR ENTERPRISES?, https://www.quantummetric.com/blog/what-is-session-replay-for-enterprises/.

[12] Id.

34.    Sentry explains, "Sentry's Session Replay … [is] a recording of the web browsers' DOM. It is … a reconstruction of the web page as the user saw it."[13] Thus, "[t]he more DOM state changes that occur in the application lifecycle, the more events that are captured, transmitted, etc."[14] "As [Sentry clients] play back each session, [they are] able to see every user interaction in relation to network requests, DOM events, and console messages."[15]

35.    The end result is that Hotjar, Quantum Metric, and Sentry's session replay wiretaps provide real-time recordings of users' interactions on the Website, while those same interactions are being transmitted over the Internet.  That is, session replay is used by Hotjar, Quantum Metric, and Sentry to surreptitiously capture and/or record, in real time, the keystrokes, mouse clicks and movement, scrolling, data entry, and/or other electronic communications of Website users.

36.    Hotjar states: "Recordings … [v]isually captur[e] interactions such as clicks, mouse movements, scroll behavior, and keystrokes[,] offer[ing] profound insights into user engagement, pain points, and preferences."[16]  Hotjar makes clear, "[b]y piecing together each action within a session, Hotjar generates comprehensive recordings that reflects user behavior on the website, which can then be analyzed further."[17]

37.    Quantum Metric states: "Like recorded videos, user replays capture exactly (or almost exactly) how each user navigated through a digital product, including clicks, typing, swiping, tapping, scrolling, and cursor movements."[18]

---

[13] SENTRY, SESSION REPLAY FAQS, https://help.sentry.io/product-features/other/what-is-session-replay/.

[14] *Id.*

[15] SENTRY, SESSION REPLAY, https://docs.sentry.io/product/session-replay/.

[16] HOTJAR, HOW DO RECORDINGS WORK: ADVANCED EXPLANATION, https://help.hotjar.com/hc/en-us/articles/21825186925207-How-do-Recordings-Work-Advanced-Explanation.

[17] *Id.*

[18] QUANTUM METRIC, WHAT IS USER REPLAY?, https://www.quantummetric.com/glossary/user-replay-v-170/.

---

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED        12
CASE NO. 2:24-cv-02603-GW-SSC

Quantum Metric further describes how its "Felix AI automatically summarizes the thousands of data points collected in a user session and consolidates the session timeline into a short, readable summary."[19]

38.    Sentry states that "Sentry's Session Replay provides a video-like reproduction of user interactions on a site or web app, giving developers the details they need to resolve errors and performance issues faster. All user interactions - including page visits, mouse movements, clicks, and scrolls - are captured, helping developers connect the dots between a known issue and how a user experienced it in the UI."[20]

39.    Session replay technology is not widely known by the public.  Most website owners don't disclose the use of session replay on their websites out of fear of unnerving website visitors and suppressing website traffic.  Any disclosures in privacy policies are futile, because by the time anyone will have seen such a disclosure, the session replay technology will have already been deployed.

40.    Further, as a 2017 study by Princeton University researchers recognized, "the extent of data collected by these services **far exceeds user expectations**[]; text typed into forms is collected before the user submits the form, and precise mouse movements are saved, all without any visual indication to the user. This data can't reasonably be expected to be kept anonymous."[21]

41.    And session replay is not only highly intrusive, but dangerous.  The 2017 study by Princeton University researchers found that session replay technologies were collecting sensitive user information such as passwords and credit card numbers.  The research notes that this wasn't simply the result of a bug, but

---

[19] QUANTUM METRIC, SESSION REPLAY, THE RIGHT WAY, https://www.quantummetric.com/platform/session-replay/.

[20] SENTRY, SESSION REPLAY FAQS, https://help.sentry.io/product-features/other/what-is-session-replay/.

[21] Steven Englehardt, *No boundaries: Exfiltration of personal data by session-replay scripts*, Nov. 15, 2017, https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/. (emphasis added).

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                13
CASE NO. 2:24-cv-02603-GW-SSC

rather, insecure practices.[22] Thus, session replay technologies such as those operated by Hotjar, Quantum Metric, and Sentry can leave users vulnerable to data leaks and the harms resulting therefrom.

**B. Defendant Enables Hotjar, Quantum Metric, and Sentry to Wiretap Californians**

42. Pursuant to agreements with Hotjar, Quantum Metric, and Sentry, Defendant voluntarily embedded the session replay wiretaps on its Website. This allowed Hotjar, Quantum Metric, and Sentry to surreptitiously collect interactions between Sonesta and its Website users.

43. Some aspects of the operation of the Hotjar, Quantum Metric, and Sentry wiretaps on the Website can be observed using developer tools – listing incoming and outgoing Website network transmissions. Specifically, when the Website is loaded into a browser, the Website evinces Hotjar, Quantum Metric, and Sentry network transmissions.

---

[22] *Id.*

44.    As shown by the yellow highlights in the above excerpt of the Website's transmissions, Defendant has embedded Hotjar's session replay wiretap (indicated here by Request URL "https://script.hotjar.com/modules.6c99e208a7eca4afc439.js") on the Website (indicated here by the Referer URL "https://www.sonesta.com/").

| ▼ General | |
|---|---|
| Request URL: | https://ingest.quantummetric.com/horizon/sonesta?T=B&u=https%3A%2F%2Fwww.sonesta.com%2F&t=1717522957801&v=1717522963820&H=0f525f667f5d1a0675313692&s=58bb5e89381a9c678b00bcf93c35f42d&S=12212&N=92&P=2&z=1 |
| Request Method: | POST |
| Status Code: | ● 200 OK |
| Remote Address: | 34.31.195.231:443 |
| Referrer Policy: | strict-origin-when-cross-origin |
| ▼ Response Headers | |
| Access-Control-Allow-Credentials: | true |
| Access-Control-Allow-Origin: | https://www.sonesta.com |
| Content-Length: | 0 |
| Content-Type: | application/json |
| Date: | Tue, 04 Jun 2024 17:42:44 GMT |
| Strict-Transport-Security: | max-age=31536000 |
| ▼ Request Headers | |
| :authority: | ingest.quantummetric.com |
| :method: | POST |
| :path: | /horizon/sonesta?T=B&u=https%3A%2F%2Fwww.sonesta.com%2F&t=1717522957801&v=17175229638 20&H=0f525f667f5d1a0675313692&s=58bb5e89381a9c678b00bcf93c35f42d&S=122 12&N=92&P=2&z=1 |
| :scheme: | https |
| Accept: | */* |
| Accept-Encoding: | gzip, deflate, br, zstd |
| Accept-Language: | en-US,en;q=0.9 |
| Content-Length: | 5006 |
| Content-Type: | text/plain |
| Origin: | https://www.sonesta.com |
| Priority: | u=1, i |
| Sec-Ch-Ua: | "Google Chrome";v="125", "Chromium";v="125", "Not.A/Brand";v="24" |
| Sec-Ch-Ua-Mobile: | ?0 |
| Sec-Ch-Ua-Platform: | "Windows" |
| Sec-Fetch-Dest: | empty |
| Sec-Fetch-Mode: | cors |
| Sec-Fetch-Site: | cross-site |

45.    As shown by the yellow highlights in the above excerpt of the Website's transmissions, Defendant has embedded Quantum Metric's session replay wiretap (indicated here by Request URL "https://ingest.quantummetric.com/horizon/sonesta" and the ":authority:" header "ingest.quantummetric.com") on the Website (indicated here by the Origin URL "https://www.sonesta.com").

46.     As shown by the yellow highlights in the above excerpt of the Website's transmissions, Defendant has embedded Sentry's session replay wiretap (indicated here by the Request URL including "ingest.sentry.io/api/"; the ":authority:" header including "ingest.sentry.io"; and the ":path:" header including "sentry_client=sentry.javascript.gatsby") on the Website (indicated here by the Origin URL "https://www.sonesta.com").

**V.     Defendant Aids, Agrees with, Employs, or Otherwise Enables CartStack, Google, and Koddi to Wiretap Californians' Communications with Tracking Technologies, in Violation of CIPA**

**A.     Overview of the CartStack, Google, and Koddi Trackers**

47.     CartStack, Google, and Koddi each wiretap the Website with their respective tracking technologies.

48.     CartStack offers "[m]ultichannel cart abandonment [and] customer recovery campaigns" that "send[] targeted messages to buyers at all stages of [the]

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED          16
CASE NO. 2:24-cv-02603-GW-SSC

conversion funnel, helping [to] recover [] abandoned carts[.]"[23]  CartStack explains that its various functions allow for "pass[ing] product data (eg: product name, image, price, etc.) to our system"[24]; "pass[ing] custom data into CartStack so it can be used to personalize [] email[s]"[25]; and "track[ing] recovered revenue."[26]  CartStack also "capture[s ] email address in order to send [users] a cart reminder email."[27] Specifically, "[i]f [a] customer abandons their cart without completing a purchase, their email address will be added to the [CartStack] send queue so that [CartStack] can send them an email inviting them back to [] complete their purchase."[28]

49.     According to Google, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[29]  "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site."[30]  Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page."[31]  This is done through "events" which "let [clients] measure … when someone loads a page, clicks a link, [] makes a purchase[]" and more.[32] Google provides a menu of "recommended events" (i.e., "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item";

---

[23] CARTSTACK, RECOVER LOST CUSTOMERS & ABANDONED CART SALES AUTOMATICALLY, https://www.cartstack.com/.

[24] CARTSTACK, SETCARTITEM, https://help.cartstack.com/article/40-setcartitem.

[25] CARTSTACK, SETDATAITEM, https://help.cartstack.com/article/41-setdataitem.

[26] CARTSTACK, SETCARTTOTAL, https://help.cartstack.com/article/39-setcarttotal.

[27] CARTSTACK, HOW DOES CARTSTACK WORK?, https://help.cartstack.com/article/150-how-does-cartstack-work.

[28] Id.

[29] GOOGLE, HOW GOOGLE ANALYTICS WORKS, https://support.google.com/analytics/answer/12159447.

[30] Id.

[31] Id.

[32] GOOGLE, SET UP EVENTS, https://developers.google.com/analytics/devguides/collection/ga4/events.

---

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED           17
CASE NO. 2:24-cv-02603-GW-SSC

"views their shopping cart")[33] and also allows for "collect[ing] additional information that Google Analytics does not collect automatically[,]" through "custom events."[34]

50.     Koddi's "enterprise platforms utilize artificial intelligence and first-party data to enhance the shopping experience[,] … optimize performance across channels for advertisers, and drive revenue growth and profit for marketplaces."[35] Specifically, Koddi looks to "searches, impressions, clicks, and bookings" on sites like Defendant's, "utilizes all th[is] relevant data [] about [a] hotel, processes it through a machine learning model, and generates a recommendation … enabling [ad] campaign automation[.]"[36]

51.     The CartStack, Google, and Koddi tracking libraries, like the Hotjar, Quantum Metric, and Sentry session replay code, send secret instructions to a Website user's browser, without alerting the individual that this is happening.  The trackers and session replay code then cause the browser to secretly and simultaneously duplicate the user's Website communications, transmitting these communications to the Third Parties' servers alongside additional information about the Website user's identity.  This entire process occurs within milliseconds.  In other words, when a user communicates with Defendant's Website, those communications are simultaneously and contemporaneously duplicated and sent to the Third Parties at the same time as they are being sent to Defendant.  Thus, the Third Parties' interception of these communications occurs "in transit."  *See, e.g.*, *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) ("Permitting an entity to

[33] GOOGLE, [GA4] RECOMMENDED EVENTS, https://support.google.com/analytics/answer/9267735.

[34] GOOGLE, [GA4] CUSTOM EVENTS, https://support.google.com/analytics/answer/12229021.

[35] KODDI, BUILD YOUR OWN COMMERCE MEDIA BUSINESS, https://koddi.com/.

[36] KODDI, MAXIMIZING BOOKINGS AND REVENUE WITH KODDI DEMAND BUDGET RECOMMENDATIONS, https://koddi.com/maximizing-bookings-and-revenue-with-koddi-demand-budget-recommendations/.

engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion…"); *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) ("Even if the browser caused a parallel signal to be sent to NaviStone, that intervention happened while the signal was already in transit from Revitch's device. Section 631's protections extend explicitly to the beginnings and ends of communications…"); *James v. Walt Disney Co.*, --- F. Supp. 3d ---, 2023 WL 7392285, at *15-16 (N.D. Cal. Nov. 8, 2023) (finding in-transit interception was alleged based on similar process to the one alleged herein).

     **B.**    **Defendant Enables CartStack, Google, and Koddi to Wiretap Californians**

     **1.**    **CartStack**

52.    CartStack, as enabled by Defendant, contemporaneously intercepts the following Website communications:

**▼Form Data**    view source    view URL-encoded

cartstack_data: [["setSiteID","k5daY1xK"],["setAttribute",{"hotelid":"SH"}],["setDataItem",{"property_name":"Sonesta Los Angeles Airport LAX"}],["setDataItem",{"checkin_date":"Jun 05"}],["setDataItem",{"checkout_date":"Jun 06"}],["setDataItem",{"returnurl":"https://www.sonesta.com/sonesta-hotels-resorts/ca/los-angeles/sonesta-los-angeles-airport-lax#rooms"}],["setAPI","browse"],["setTrackVisitor",0],["setReferringURL","https://www.sonesta.com/sonesta-hotels-resorts/ca/los-angeles/sonesta-los-angeles-airport-lax#rooms"],["setBrowserOSDetails","Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/125.0.0.0 Safari/537.36"],["setIPValidUser",1],["setCartID",""],["setBrowseItem",{"productID":"","productName":"www.sonesta.com","productDescription":"","productURL":"www.sonesta.com","productImageURL":"www.sonesta.com","productPrice":"","imageWidth":"100"}]]

**▼Form Data**    view source    view URL-encoded

cartstack_data: [["setSiteID","k5daY1xK"],["setEmail","thommy5431@yahoo.com"],["setCartTotal",190.56],["setDataItem",{"roomimage":"https://media.iceportal.com/136733/photos/73023214_4K.jpg"}],["setDataItem",{"tripdates":"Jun 5 - Jun 6 (1 Night)"}],["setDataItem",{"arrivaldate":"2024-06-05"}],["setDataItem",{"departuredate":"2024-06-06"}],["setDataItem",{"hotelid":"SH"}],["setDataItem",{"propertyname":"Sonesta Los Angeles Airport LAX"}],["setDataItem",{"roomname":"Deluxe - Two Doubles"}],["setDataItem",{"returnurl":"https://www.sonesta.com/sonesta-hotels-resorts/ca/los-angeles/sonesta-los-angeles-airport-lax?checkin=2024-06-05&checkout=2024-06-06"}],["setDataItem",{"firstname":"Sophia"}],["setIPHash","53e2782c187bb056334bc3ef14dde119"],["setTrackVisitor",0],["setReferringURL","https://www.sonesta.com/checkout"],["setBrowserOSDetails","Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/125.0.0.0 Safari/537.36"],["setIPValidUser",1],["setCartID",""],["setBrowseID","153602234"]]

53.    As shown by the red highlight in above excerpts of the Website's transmissions, CartStack intercepts the destination and hotel selected by users (here, "Sonesta Los Angeles Airport LAX"). As shown by the yellow highlights, CartStack intercepts the desired trip dates selected by users (here, "'checkin_date':'Jun 05'" and

"'checkout_date':'Jun 06'"). As shown by the green highlight, CartStack intercepts the type of room selected by users (here, "'roomname':'Deluxe – Two Doubles'").  As shown by the blue highlights, CartStack intercepts "record[s] that identif[y] an individual[.]"  Cal. Civil Code § 53.5(c).  Specifically, CartStack intercept personal information (first name, email address) typed by Website users while checking out on sonesta.com (here, "Sophia" and "thommy5431@yahoo.com," respectively).

### 2.   Google

54.   Google, as enabled by Defendant, contemporaneously intercepts the following Website communications:

```
▼Query String Parameters      view source      view URL-encoded
  v: 1
  _v: j101
  a: 1636566449
  t: event
  ni: 1
  _s: 1
  dl: https://www.sonesta.com/
  dp: /
  ul: en-us
  de: UTF-8
  dt: Sonesta - Hotels, Resorts and Cruises | Sonesta
  sd: 24-bit
  sr: 1920x1080
  vp: 1607x885
  je: 0
  ec: Search Term
  ea: los angeles
  _u: yCCACEAjBAAAgCgAIAC~
  jid:
  gjid:
  cid: 1431969611.1717432744
  tid: UA-733428-1
  _gid: 1444099681.1717432744
  gtm: 45He45t0n71WZ2W5Cv6703863za200
  gcs: G111
  gcd: 13t3t3t3t5
  dma: 0
  z: 545916558
```

55.   As shown by the red highlight in the above excerpt of the Website's transmissions, Google intercepts the destination searched by users (here, indicating the "Search Term" of "Los Angeles").

```
dl: https://www.sonesta.com/
dp: /
ul: en-us
de: UTF-8
dt: Sonesta - Hotels, Resorts and Cruises | Sonesta
sd: 24-bit
sr: 1920x1080
vp: 1607x885
je: 0
ec: link
ea: click
el: decrease-adults -
_u: yCCAiEAjBAAAgCgAIAC~
```

```
dl: https://www.sonesta.com/
dp: /
ul: en-us
de: UTF-8
dt: Sonesta - Hotels, Resorts and Cruises | Sonesta
sd: 24-bit
sr: 1920x1080
vp: 1607x885
je: 0
ec: link
ea: click
el: increase-children -
_u: yCCAiEAjBAAAgCgAIAC~
```

56.     As shown by the yellow highlight in the above excerpts of the Website's transmissions, Google intercepts when users click on the Website's buttons to increase and decrease the number of adults and children who will be traveling (here, indicated by "click" on "decrease-adults" and "click" on "increase-children").

```
▼Query String Parameters     view source     view URL-encoded
    v: 1
    _v: j101
    a: 1636566449
    t: event
    ni: 1
    _s: 1
    dl: https://www.sonesta.com/
    dp: /locations/us/california/los-angeles
    ul: en-us
    de: UTF-8
    dt: Sonesta - Hotels, Resorts and Cruises | Sonesta
    sd: 24-bit
    sr: 1920x1080
    vp: 1607x885
    je: 0
    ec: Click Activity
    ea: Hotel Search
    el: Hotel Search - Location Search Check-in Date Check-out Date Select Room and Guest Count 1 Room, 3 Guests Select Rate Type Lowest Regular Rate Find Hotel
    _u: yCCACEArBAAAgGgMIAC~
    jid:
    gjid:
    cid: 1431969611.1717432744
    tid: UA-733428-1
```

57.     As shown by the red highlight in the above excerpt of the Website's transmissions, Google intercepts the destination selected by users (here, "locations/us/california/los-angeles").   As shown by the yellow highlight in the above excerpts of the Website's transmissions, Google intercepts the numbers of rooms and guests selected by users (here, "Guest Count 1 Room, 3 Guests").  As shown by the green highlights, Google intercepts the special rates selected by users (here, "Select Rate Type Lowest Regular Rate").

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED          21
CASE NO. 2:24-cv-02603-GW-SSC

58.     As shown by the red highlights in the above excerpts of the Website's transmissions, Google intercepts the destination selected by users (here, "Product%20Click"; "click"; and "Add to Cart" shown for "California%2Flos-angeles"; "Los%20Angeles"; "Los%20Angeles%2C%20California"; "Sonesta%20Los%20Angeles%20Airport%20LAX"; "sonesta-los-angeles-airport-

lax"; and "Sonesta Los Angeles Airport LAX").

### 3. Koddi

59.    Koddi, as enabled by Defendant, contemporaneously intercepts the following Website communications:

60.    As shown by the red highlights in the above excerpts of the Website's transmissions, Koddi intercepts the destination selected by users (here, "destCity: Los Angeles, CA" and "destCity: Sonesta Los Angeles Airport LAX").   As shown by the yellow highlights in the above excerpts of the Website's transmissions, Koddi intercepts the desired trip dates selected by users (here, "checkIn: 2024-06-05" and

"checkout: 2024-06-06").  As shown by the green highlights, Koddi intercepts the numbers of rooms and guests selected by users (here, "rooms: 1"; "adults: 2"; and "children: 1").

**VI.    The Third Parties Use Californians' Data for their Own Purposes**

61.    When the Third Parties use their respective wiretaps on Website users' communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other.  Instead, the Third Parties—separate and distinct entities from the parties to the conversations—use the wiretaps to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties.  The Third Parties, themselves, collect the contents of said conversations.  That data is then analyzed by the Third Parties before being provided to any entity that was a party to the conversations (like Defendant).

62.    The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes.

63.    In its "Terms of Service," Hotjar states: "We reserve the right to access Your Account, the information that You have provided and the Data You have stored with Us for support, maintenance and servicing purposes or for any security-related, technical or billing reasons."[37]  Further, Hotjar states: "You grant Hotjar and its Affiliates a non-exclusive, perpetual, worldwide, royalty-free, right and license to (i) compile and use Data, strictly in order to research, develop, modify, improve or support the services provided by Hotjar and its Affiliates; (ii) use Data in an anonymous or aggregated form where no such information could directly identify or will reasonably be used to identify You, Your users or visitors, for benchmarking or machine learning purposes; and (iii) collect and use data, information, or insights generated or derived from the use of the Platform for its business purposes, including industry analysis, analytics, marketing, and developing, training and improving its

---

[37] HOTJAR, TERMS OF SERVICE, https://www.hotjar.com/legal/policies/terms-of-service/.

products and services. In no event will Hotjar or its Affiliates sell Data to third parties for any marketing or advertising purposes whatsoever."[38]   Thus, Hotjar has the capability to use the wiretapped data it collects to for research, development, product and service improvement, benchmarking and machine learning, and business purposes like analytics and marketing.

64.     In its "Terms and Conditions," Quantum Metric states: "Quantum may use certain Aggregated Data in order to perform analysis and statistical reporting and for auditing, research and analysis to operate and improve Quantum technologies and services. … Quantum shall have the right to collect and analyze data and other information relating to the provision, use and performance of various aspects of the Quantum Service and related systems and technologies (including, without limitation, information concerning Customer Data and data derived therefrom), and Quantum will be free (during and after the Term) to use such information and data to improve and enhance the Quantum Technology and for other development, diagnostic and corrective purposes in connection with the Quantum Service and other Quantum offerings, and to disclose such data solely in aggregate or other de-identified form in connection with its business."[39]   Thus, Quantum Metric has the capability to use the wiretapped data it collects for analysis, statistical reporting, auditing, research, and improving its technologies and services.

65.     In its "Terms of Service," Sentry states: "Subject to this Agreement, and solely to the extent necessary to provide, maintain and improve the Service and Support to Customer, Customer grants Sentry the non-exclusive, worldwide right, during the term of this Agreement, to access, use, process, copy, perform, store, export, transmit and display Service Data."[40]   Further, Sentry states: "Sentry may collect and

---

[38] *Id.*

[39] QUANTUM METRIC, TERMS AND CONDITIONS, https://iam.quantummetric.com/terms-and-conditions.

[40] SENTRY, TERMS OF SERVICE, https://sentry.io/terms/.

use Usage Data to operate, improve and support the Service and for Additional Uses. Sentry will not disclose Usage Data externally, including in benchmarks or reports, unless it has been Aggregated or Anonymized."[41]  Sentry states "'Additional Uses' means any legitimate business purposes such as analytics, benchmarking, reporting and developing new products and services."[42] Thus, Sentry has the capability to use the wiretapped data it collects for improving and supporting its services, as well as for business purposes such as analytics, benchmarking, and product and service development.

66.    In its "CartStack Service Agreement," CartStack states: "CartStack and its third-party licensors (as appropriate) shall retain all Intellectual Property Rights in the Service and Usage Data. … CartStack shall have a perpetual, royalty-free, irrevocable, world-wide license to use, sublicense, and publish derivative works and compilations resulting from collection and analysis of Usage Data."[43]  CartStack defines "Usage Data" as "any data that CartStack collects or generates during the performance of the Service, including non-confidential elements of Customer Data."[44] Thus, CartStack has the capability to use the wiretapped data it collects for creating derivative works, compilations, and analysis.

67.    In its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "When Google Analytics customers enable the data sharing setting for … Google Analytics[] and accept the 'Measurement Controller-Controller Data Protection Terms' … Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and

---

[41] *Id.*

[42] *Id.*

[43] CARTSTACK, CARTSTACK SERVICE AGREEMENT, https://www.cartstack.com/sign-up/terms-popup.html.

[44] *Id.*

build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance."[45]   Thus, Google can have the capability to use the wiretapped data it collects for understanding online behavior and trends, machine learning, and improving its products and services.

68.   In its "Terms of Service," Koddi states: "Client agrees that Koddi will have the right to generate Aggregate Data and that Aggregate Data is the sole and exclusive property of Koddi, which Koddi may use for any business purpose (including without limitation to develop and improve Koddi's products and services and to create and distribute reports and other materials). … Client acknowledges that Koddi may delete Client Data no longer in active use. Koddi expressly disclaims all other obligations with respect to storage."[46]   Thus, Koddi has the capability to use the wiretapped data it collects for any business purpose.

## VII.   Defendant Never Received Users' Consent to Disclose their Confidential Communications to the Third Parties

69.   To summarize the above allegations, the Third Parties, as enabled by Defendant, collect the contents of Californians' communications with the Website using the *supra* tracking technologies.  These communications include, but are not limited to, "guest records."  *See supra* § II.  This information is not anonymized (*Id.*) and this is information that is affirmatively entered by users in the Website.  *See supra* § III.

70.   Crucially, neither Defendant nor the Third Parties procure prior consent from Californians for the Third Parties to engage in this wiretapping.

71.   Sonesta's "Terms of Use" merely state: "Please review our internet

---

[45] GOOGLE, SHARED DATA UNDER MEASUREMENT CONTROLLER-CONTROLLER DATA PROTECTION TERMS, https://support.google.com/analytics/answer/9024351.
[46] KODDI, TERMS OF SERVICE, https://koddi.com/terms-of-service/.

privacy policy by following the link at the bottom of the web page. At times our privacy policy may be changed and any updates will be posted to this site."[47] This "Privacy Notice" reads: "To Whom We Disclose Personal Data for a Business Purpose[:] In the course of processing your personal data in connection with fulfilling bookings and providing other products and services you obtain from us, it may be necessary to transfer your personal data to: . . . Payment processors and/or third-party service providers . . . for the purposes outlined in this Privacy Notice[; and] Business partners, sponsors, and other third parties[.] . . . When We Disclose Your Personal Data[:] . . . When we have received your consent to do so[.] . . . We are not responsible for the collection, usage, and disclosure policies and practices (including data security) of other organizations, such as Facebook[.]"[48] But, as set out *supra*, Defendant allows for data collection, including by the Third Parties, even when it has not received Website users' consent to do so.

72.    Likewise, Sonesta's "Travel Pass Terms of Use" merely state: "Members also authorize Sonesta to share your account information with subsidiaries and third parties, such as Program partners and technology service providers in order to service your Membership account and to facilitate the booking and processing of reservations."[49] This is inadequate for a few reasons. First, insofar as the Travel Pass Terms do disclose the sharing of information with third parties, said disclosure is restricted to "account information" shared "to service [] Membership account[s] and facilitate the booking and processing of reservations." The communications at issue are not limited to "account information" and the communications are not shared exclusively to facilitate booking and processing reservations.    Rather, the

---

[47] SONESTA INTERNATIONAL HOTELS CORPORATION, TERMS OF USE, https://www.sonesta.com/terms-use.

[48] SONESTA INTERNATIONAL HOTELS CORPORATION, PRIVACY NOTICE, https://www.sonesta.com/privacy.

[49] SONESTA INTERNATIONAL HOTELS CORPORATION, SONESTA TRAVEL PASS TERMS AND CONDITIONS, https://www.sonesta.com/travel-pass/terms-conditions.

communications are wiretapped for, *inter alia*, advertising and marketing, as well as the Third Parties' respective own uses.  *See supra* § VI.  Second, users never meaningfully assent to these terms, as they merely appear as hyperlinked "browsewrap" in small, difficult-to-see font buried on the "Join Travel Pass" page[50]:



Third, Travel Pass members who join at the checkout stage of the booking process (as shown below) will have already been wiretapped by the Third Parties, prior to their being so much as asked to sign up for the Travel Pass as they book:



---

[50] SONESTA INTERNATIONAL HOTELS CORPORATION, JOIN TRAVEL PASS, https://www.sonesta.com/join-travel-pass.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED          29
CASE NO. 2:24-cv-02603-GW-SSC

73. Further, Defendant's "Manage Cookies" options show that "Strictly Necessary Cookies"; "Performance Cookies"; Functional Cookies"; and "Targeting Cookies" are turned on by default, even before a Website user selects "Accept" or "Confirm." And Defendant expressly represents that it will refrain from collecting personally identifiable information ("cookies[] information . . . does not usually directly identify you[.] . . . Because we respect your right to privacy, you can choose not to allow some types of cookies."). Further, Defendant represents that "Targeting Cookies … do not store directly personal information, but are based on uniquely identifying your browser and internet device."

 

74. As courts across the country have recognized, however, the identifiers that tracking technologies like those at issue capture—"unique identifying number[s]" assigned to Website users, including values stored in cookies, and personal information (i.e., first name, last name, email address, phone number) typed by Website users while checking out—constitute "directly personal information." By capturing this information anyway, Defendant fails to receive consent from visitors to intercept their communications.

75. Below, for example, is an image of Website cookie values associated

with Hotjar ("_hjSession" and "_hjSessionUser"); Quantum Metric ("QuantumMetricSessionID" and "QuantumMetricUserID"); CartStack ("cartstack.com-cartid"; "cartstack.com-browseid"; "cartstack.com-iphash"; "cartstack.com-email"; and "cartstack.com-validuser"); Google (those with the "Domain" ".google.com" and ".www.google-analytics.com"); and Koddi (with the "Domain" ".koddi.com").

| Name | Value | Domain |
|---|---|---|
| NID | 514=mvwQInwu9K2i7pQgyXkN1Wn83Lhn8bTuRq50... | .google.com |
| AEC | AQTF6HwXkkP8yZ8nfSpzu3oAgXVVqy2nbeeuf47Wq... | .google.com |
| 1P_JAR | 2024-06-05-00 | .google.com |
| SEARCH_SAMESITE | CgQIoZsB | .google.com |
| hmGUID | 368cb4ba-ba43-4e30-1283-529cc3e9b58e | .koddi.com |
| cartstack.com-cartid | 273504018 | .sonesta.com |
| QuantumMetricSessionID | e411cfc4008ce3da6f1a4d3fada6a65a | .sonesta.com |
| _hjSession_2767647 | eyJpZCI6ImQxYWMzYTg5LWYwMzctNGZjOS05NjQ4... | .sonesta.com |
| cartstack.com-browseid | 153369038 | .sonesta.com |
| _hjSessionUser_2767647 | eyJpZCI6ljhhMjg0NGU3LTImZTAtNTZkMC1hNmJjLW... | .sonesta.com |
| cartstack.com-iphash | 53e2782c187bb056334bc3ef14dde119 | .sonesta.com |
| cartstack.com-email | thommy5431@yahoo.com | .sonesta.com |
| cartstack.com-validuser | 1 | .sonesta.com |
| QuantumMetricUserID | 109f0a2b9030baf9a8177d33a7ecc06f | .sonesta.com |
| ar_debug | 1 | .www.google-analytics.com |
| ai_session | VTBrzx/LODHONk4PvINPWP\|1717546342804\|17175... | www.sonesta.com |
| ai_user | rsFHRNrNiuJb846yhSy16d\|2024-06-05T00:12:22.588Z | www.sonesta.com |

## **CLASS ALLEGATIONS**

76.   Plaintiff seeks certification of the following class: all California residents who have accessed and navigated the Website while in California (the "Class").

77.   Plaintiff reserves the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

78.   The following people are excluded from the Class: (1) any Judge presiding over this action and members of her or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely

request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

79.    **Numerosity:** The number of persons within the Class is substantial and believed to amount to thousands, if not millions of persons.  It is, therefore, impractical to join each member of the Class as a named plaintiff.  Further, the size and relatively modest value of the claims of the individual members of the Class render joinder impractical.  Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation.  Moreover, the Class is ascertainable and identifiable from Defendant's records.

80.    **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following: whether Defendant violated CIPA §§ 631 and 632 and whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

81.    **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other class members, visited the Website and had her confidential electronic communications intercepted and disclosed to the Third Parties.

82.    **Adequate Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in

prosecuting class actions, and she intends to prosecute this action vigorously. The interests of members of the Class will be fairly and adequately protected by Plaintiff and her counsel.

83. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes. Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**CAUSES OF ACTION**

**COUNT I**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 631(a)**

84. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

85. Plaintiff brings this claim against Defendant individually and on behalf of the Class.

86. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other

manner," does any of the following:

Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

*Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

87.    CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

88.    The Third Parties' tracking technologies are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED          34
CASE NO. 2:24-cv-02603-GW-SSC

89. Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiff and Class Members, on the one hand, and Defendant, on the other. *Id*. at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

90. At all relevant times, by their tracking technologies, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

91. At all relevant times, the Third Parties used or attempted to use the communications intercepted by their tracking technologies for their own purposes.

92. At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled the Third Parties to wiretap Plaintiff and Class Members using the Third Parties' tracking technologies and to accomplish the wrongful conduct at issue here.

93. Plaintiff and Class Members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Class Members' electronic communications. Nor did Plaintiff and Class Members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct.

94. The wiretapping of Plaintiff and Class Members occurred in California, where Plaintiff and Class Members accessed the Website and where the Third Parties—as enabled by Defendant—routed Plaintiff's and Class Members' electronic communications to their servers.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED          35
CASE NO. 2:24-cv-02603-GW-SSC

95. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## COUNT II
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 632

96. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

97. Plaintiff brings this claim against Defendant individually and on behalf of the Class.

98. CIPA § 632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

99. The Third Parties' tracking technologies are "electronic amplifying or recording device[s]."

100. Cal. Civ. Code § 53.5(a) states:

> [A]n innkeeper, hotelkeeper, motelkeeper, lodginghouse keeper, or owner or operator of an inn, hotel, motel, lodginghouse, or other similar accommodations, or any employee or agent thereof, who offers or accepts payment for rooms, sleeping accommodations, or board and lodging, or other similar accommodation, shall not disclose, produce, provide, release, transfer, disseminate, or otherwise communicate, except to a California peace officer, all or any part of a guest record orally, in writing, or by electronic or any other means to a third party without a court-issued subpoena, warrant, or order.

101. Per Cal. Civil Code § 53.5(c):

> "Guest record" for purposes of this section includes any record that identifies an individual guest, boarder, occupant, lodger, customer, or invitee, including, but not limited to, their name, social security

number or other unique identifying number, date of birth, location of birth, address, telephone number, driver's license number, other official form of identification, credit card number, or automobile license plate number.

102. Here, Website users' communications with Sonesta—made while browsing and booking Sonesta hotels via the Website—contain sensitive and confidential "guest records," as defined by Cal. Civil Code § 53.5.

103. First, the communications include "record[s] that identif[y] an individual[.]" Cal. Civil Code § 53.5(c). As described *infra*, the Third Parties' tracking technologies compel Website users' browsers to transmit "unique identifying number[s]" assigned to Website users, including values stored in cookies. Cal. Civil Code § 53.5(c). The Third Parties' tracking technologies further intercept personal information (i.e., first name, last name, email address, phone number) typed by Website users while checking out on sonesta.com. These are all "record[s] that identif[y] an individual[.]" Cal. Civil Code § 53.5(c).

104. Second, Website users' communications with Sonesta "identif[y] an individual [as a Sonesta] guest, boarder, occupant, lodger, customer, or invitee[.]" *Id.* The Third Parties intercept Website users' text entry and button clicks selecting the destination to which they wish to travel, the desired dates for their trip, the number of rooms they require, the numbers of adults and children who will be traveling, and the particular hotel and room type in which they wish to stay. The Third Parties also intercept the URLs of webpages visited by Website users—containing the foregoing communications. These communications "identif[y] an individual [as a Sonesta] guest, boarder, occupant, lodger, customer, or invitee" (Cal. Civil Code § 53.5(c)) because they show that all Website users are "invitees" of Sonesta—individuals with "express or implied invitation to enter or use [Sonesta's] premises."[51] These communications also identify certain Website users (those who complete the booking

---

[51] INVITEE, Black's Law Dictionary (11th ed. 2019).

process) as Sonesta hotel "guests" and "customers."

105.   Thus, the Third Parties—as aided by Defendant—intercepted "guest records," which are confidential, under Cal. Civil Code § 53.5.  Moreover, none of the Third Parties is a legitimate "third-party service provider," as defined by Cal. Civil Code § 53.5(f), because none of the Third Parties is "an entity contracted to provide services outlined in [a] contract [with Sonesta] that has no independent right to use or share the data beyond the terms of the contract."  Rather, the Third Parties have the capability to use the information they wiretap for purposes other than simply providing a recording to Defendant.  *See infra* § VI.  Therefore, Sonesta's conduct here at issue was not permitted by, *inter alia*, Cal. Civil Code § 53.5(i).

106.   When communicating with Defendant, Plaintiff and Class Members had an objectively reasonable expectation of privacy, based on Cal. Civil Code § 53.5.  Thus, Plaintiff and Class Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other, Third Party entities would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

107.   Plaintiff and Class Members did not consent to any of the Third Parties' actions.  Nor have Plaintiff or Class Members consented to the Third Parties' intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

108.   Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)   For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)   For an order declaring that Defendant's conduct violates the statute referenced herein;

(c)   For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)   For actual, compensatory, statutory, and/or punitive in amounts to be determined by the Court and/or jury;

(e)   For prejudgment interest on all amounts awarded;

(f)   For an order of restitution and all other forms of equitable monetary relief;

(g)   For injunctive relief as pleaded or as the Court may deem proper; and

(h)   For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit.

## **JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated:  June 7, 2024                         Respectfully submitted,

                                             **BURSOR & FISHER, P.A**.


                                             By:   _/s/ Brittany S. Scott_
                                                     Brittany S. Scott

                                             L. Timothy Fisher (State Bar No. 191626)
                                             Brittany S. Scott (State Bar No. 327132)
                                             1990 North California Blvd., Suite 940
                                             Walnut Creek, CA 94596
                                             Telephone: (925) 300-4455

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED          39
CASE NO. 2:24-cv-02603-GW-SSC

Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
bscott@bursor.com

*Attorneys for Plaintiff*